OPINION OF THE COURT
Alice Schlesinger, J.
If one were to identify cases illustrative of New York City Housing Authority (NYCHA) policies and procedures that cry out for change, this case would be at the top of the list. Front and center is the highly unusual requirement that a husband must obtain formal written permission from NYCHA before his wife can move in with him — a requirement that the average married couple could and would never anticipate. Additionally, and extremely problematic for a good number of NYCHA tenants, is the manner in which NYCHA applies its succession poli *403 cies and the manner in which its hearing officers conduct hearings for persons with no legal representation, limited education, limited English language abilities, and mental challenges.
As is readily apparent from the record in this case, the petitioner here, Clara Josefina Russo, presented with all those obstacles. And as demonstrated below, NYCHA’s appointment of a guardian ad litem with no legal training to appear at the hearing with Ms. Russo, while superficially appropriate, did not lead to a just hearing that satisfied the requirements of due process of law. Rather, it simply gave the facade that due process concerns were being respected. And while it is not the role of this court in a case such as this to direct NYCHA to change its policies, it is the role of the court to determine whether the hearing officer’s determination should be annulled as arbitrary and capricious and/or because the hearing failed to comport with due process of law.
Ms. Russo commenced this CPLR article 78 proceeding, initially without counsel, to annul the July 18, 2012 determination by respondent NYCHA. In that determination (petition, exhibit A), NYCHA approved the June 19, 2012 decision by NYCHA Hearing Officer Arlene Ambert denying Ms. Russo’s request to remain in the apartment as the “remaining family member” of the deceased tenant of record Efrain Plumey, who had been Ms. Russo’s husband. The sole basis for the Hearing Officer’s decision was the finding that “[t]he Tenant [Efrain Plumey] did not receive written permanent permission of the Housing Authority for the Grievant [his wife Clara Russo] to reside in the subject apartment.”
Background Facts
In or about 1993, Efrain Plumey became the tenant of the subject apartment 4A at 700 East 156th Street in NYCHA’s Saint Mary’s Park development in upper Manhattan. (Answer, exhibit K.)[1] At the time, Plumey was married to petitioner Clara Josefina Russo; in fact, they had been married since 1975 (exhibit V). Russo did not move into the apartment with Plumey at that time, but their daughter Anna Plumey, who had been born January 19, 1976, did, and Ms. Russo apparently visited her there on a regular basis over the years.
That pattern continued until some time before 2007 when Anna apparently moved to Webster Avenue in the Bronx, while
*404 Mr. Plumey remained in the apartment (exhibits D-G). In the last income affidavit he filed in 2009, Mr. Plumey listed only himself as an occupant of the apartment (exhibit G). When asked the prior year to indicate on the form whether anyone in the household had a disability, he answered “no . . . but I am 87 yr old” (exhibit F). NYCHA has not included in the record that part of the form for 2009.
On May 30, 2010, Mr. Plumey passed away (exhibit L). Shortly thereafter, Ms. Russo reported the death to NYCHA and confirmed that she had been living there as Mr. Plumey’s wife and that she wished to stay in the apartment and pay the rent herself (which she has been doing without fail). Much to her surprise, her request was denied because Mr. Plumey had not obtained NYCHA’s permission for the co-occupancy. Specifically, the project manager wrote in the July 2, 2010 project grievance summary (exhibit N) that
“Ms. Russo stated that she gave up her apartment to care for her husband Efrain Plumey who was ill. She further claims that she has been residing in the apartment for the last three years. Efrain [Plumey] passed away on 5/29/10. She is requesting residual tenancy. Ms. Russo has supplied the office with a death certificate (photo copy) and a copy of her 1975 marriage license to Efrain Plumey. . . .
“Clara Josefina Plumey [sic] has not been authorized to join the household. No request for permanent permission was present in the folder nor has any notation been found in the interview records. Ms. Russo has not been a household member at any time nor has she been listed on the original 1992 housing application. Due to her unauthorized occupancy she does not have residual tenancy rights.”
The borough manager approved the project manager’s disposition on January 31, 2011 (exhibit P). After noting that Ms. Russo had appeared for the borough’s review of the claim, the manager indicated that Ms. Russo was not eligible for a lease because of the written permission requirement: “If Clara Josefina Russo was living in the apartment, it was without the written permission of the NYC Housing Authority.” The manager then added: “NYC Housing Authority procedure GM-3692 states that the tenant of record must have obtained permission from management in writing to allow the remaining family member to reside in the household one year before he/she died or vacated the apartment.”
*405 Ms. Russo continued to urge her position by writing a letter to the management office, dated February 17, 2011 (exhibit Q). In that letter, obviously drafted with someone’s assistance, Ms. Russo explained why written permission had not been sought, stating:
“I am writing this letter to request an appeal to your decision denying me the right to continue living in my current apartment. I understand that my husband, Efrain Plumey, did not put me on the lease and that technically I did not have the right to be there, but I believe it was a[n] oversight on his part due to our situation at home. First I was sick and he was taking care of me, and then he became gravely ill and I was taking care of him. I would very much like the opportunity to sign a lease in my name and continue living in my apartment. Please re-consider your decision and grant me this request.”
A hearing was scheduled for July 1, 2011 (exhibit R). There, buried among pages of instructions, NYCHA states its defense that “Grievant is not a Remaining Family Member in accordance with the New York City Housing Authority Management Manual, Chapter VII, Section E.” However, nowhere is NYCHA’s objection to Ms. Russo’s succession request plainly stated. Indeed, but for the address on the notice, Ms. Russo’s name is not mentioned anywhere, and it is unclear whether Ms. Russo even understood that she was the “Grievant.” NYCHA adjourned the hearing to October 12, 2011 and then to January 17, 2012, for reasons not specified (exhibit R).
However, the record suggests that at some point during that period NYCHA recognized that Ms. Russo was suffering from some type of mental disability, as a copy of the notice for the January 2012 date was also sent to “Grievant’s Representative: Ellis Shratter GAL.” According to documents provided by NYCHA with its answer, one of its attorneys, Howard Brook-man (the attorney who ultimately did the hearing), completed a NYCHA form entitled “GAL: Mental Competence Evaluation Request” on June 7, 2011 (exhibit S). There he requested that the NYCHA Social Services Department “evaluate the mental competence of’ Ms. Russo, who was then 72 years old. For a reason, he checked the box that said: “Thought Process: Within the past year, the resident has exhibited seriously confused and disordered thinking.”
*406 Ms. Russo was apparently evaluated by a NYCHA Social Worker Winsome Mattis, who indicated on the form on June 20, 2011 that “WE CONCLUDE THAT A GUARDIAN AD LITEM (GAL) IS NECESSARY IN THIS CASE AND RECOMMEND THE APPOINTMENT OF A COURT REFERRED GAL BECAUSE: We evaluated the tenant/resident but cannot determine that he or she is competent.” Supporting that conclusion was a multi-page evaluation form that included information confirming Ms. Russo’s various limitations.
For example, the report indicated that Ms. Russo was receiving “SSI in the amount of $671.00 due to nerve problems.” She had been raised in the Dominican Republic and had completed only the 10th grade in high school. She had been living on Webster Avenue for many years but then gave up her apartment and moved in with her husband to care for him when he became ill.
Under the heading “MENTAL HEALTH HISTORY,” the social worker confirmed the precise nature of Ms. Russo’s mental disability as follows:
“Tenant stated that she was diagnosed as being Schizophrenic. Tenant told SW that she is being treated by Dr. Dora Cardenas, her psychiatrist, three days per week, and has a Social Worker, Ms. Maria Kramer 212 942-8500.
“Tenant takes the following psychotropic medications:
“Risperidone - lmg
“Trihexphenidyl - 2mg
“Seroquel - 400mg
“Seroquel - 50 mg as needed.”[2]
Reporting on the mental examination results, the social worker described Ms. Russo’s thought process as “logical for the most part, up until she revealed that her dog is able to talk. She also stated that her dog prays with her.” She added that Ms. Russo “showed signs of hallucinations,” explaining that Ms. Russo “was cognizant that dogs are not able to talk but thinks her dog has special powers that enable him to communicate verbally.”
The social worker concluded the report as follows: “In light of the above mental assessment, SW is recommending a Guardian *407 Ad Litem, due to Ms. Russo’s mental impairment. SW believes that she may not be able to adequately assert her rights and interest in an administrative hearing.” How true that proved to be.
Ellis Shratter was appointed to serve as Ms. Russo’s GAL (exhibit T). The file contains no information as to what qualifications and experience, if any, Mr. Shratter had to enable him to assist Ms. Russo. He did appear with Ms. Russo at the hearing held before Hearing Officer Arlene Ambert on June 15, 2012, and NYCHA has provided to the court a complete transcript of those proceedings (exhibit U). The Hearing Officer began by receiving into evidence the above-described report of the NYCHA social worker, as well as the above-described grievance summaries at the project and borough levels.
After reciting some rules and confirming that Ms. Russo was current in the payment of use and occupancy, the Hearing Officer asked NYCHA’s counsel to state the agency’s position as to why Ms. Russo should not be allowed to remain in the apartment. Again, the sole objection to Ms. Russo’s request for a lease was the lack of prior written permission from NYCHA: “No request was made by the tenant of record to add her [Ms. Russo] to the family composition before he [the tenant of record Efrain Plumey] died.” (Tr at 10, line 20.)
The Hearing Officer then swore in Mr. Shratter, who immediately displayed his lack of familiarity with legal proceedings by indicating that he thought that NYCHA would be presenting its case first. When told to proceed, he indicated a lack of understanding of the issue framed by NYCHA, implying his belief that Ms. Russo’s marriage resolved any issue in her favor and explaining (tr at 12, line 14): “Well this is really the bottom line, anyways, Miss Russo married the tenant of record [Efrain Plumey]. She has her marriage certificate dated April 25, 1975.”
The certificate, showing that the couple had married on April 21, 1975, was admitted into evidence. Shratter then had admitted the tenant’s original family composition dated May 19, 1993, when Plumey first became a tenant, and he emphasized that the marriage preceded the tenancy by a substantial time (tr at 13). The form also indicated that the tenant’s daughter moved in with the tenant in 1993, and there is a notation dated May 1999. Ms. Russo later explained that her daughter enrolled in college at or about that time (tr at 18).
What followed was an exchange between Mr. Shratter and Ms. Russo that confirmed that Shratter did not even know a *408 material fact that was key to the resolution of the matter; i.e., the tenant’s date of death. Ms. Russo said “1910. When God took him.” (Tr at 14, line 23.) Shratter settled on 2010 and then offered the tenant’s June 30, 2009 income affidavit, which listed only the tenant (tr at 15-16). The document was admitted into evidence, even though it was incomplete and NYCHA presumably had the entire document in its possession. The death certificate was also admitted, showing a date of death of May 30, 2010 (tr at 17).
Mr. Shratter then asked to make a statement. His lack of personal knowledge was clear, as he kept turning to Ms. Russo. However, the Hearing Officer said that only one person could testify at a time, and she was then accepting only the testimony of Mr. Shratter (tr at 18) and disregarding statements by Ms. Russo — even though Mr. Shratter’s testimony had no probative value whatsoever. With confusion abounding, the Hearing Officer called a break so Mr. Shratter and Ms. Russo could review the tenant’s income affidavits for the period 1999 through 2009.
As if the documents were somehow helpful to Ms. Russo’s case, Shratter admitted into evidence a series of income affidavits, none of which listed Ms. Russo and most of which predated her occupancy of the apartment. He then sought to excuse the omission of Ms. Russo’s name on the 2009 affidavit, explaining that the tenant had brain cancer that impacted his thinking (tr at 24, line 9 ff):
“As I said before, his daughter [the daughter of the tenant and Ms. Russo] moved out in 1999, and he passed away in 2010, last income affidavit signed in the year 2009. After his daughter moved out it appears he was only putting his name down on the income affidavits, okay. We found — we can definitely prove for sure, but I’m kind of making the supposition that that’s what he was doing. The point I’m trying to make is he got used to filling out the income affidavits that way. This gentleman, the main cause of death was brain cancer and the cancer in his brain compromised, you know, a lot of his reasoning and understanding in what was going on.”
Unfortunately, the statements were highly speculative and not based on personal knowledge and thus had little, if any, probative value. Similarly lacking in probative value were the following statements about Ms. Russo, yet Shratter did not *409 have Ms. Russo testify to these facts on her own behalf and provide supporting details (tr at 25, line 1 ff):
“Within the last years of his [the tenant’s] life that Miss Russo and him became close. She would often come and stay in the apartment and then she would go back to where she was living somewhere else. There was a time when she was going back and forth, and then there came a time when due to his failing health and his failing reasoning because of his brain cancer, she felt compelled to stay there with him ... so it’s very possible you know oftentimes when he was filling out these income affidavits, he didn’t really believe she was an occupant of the apartment because she went back and forth, and he also got used to signing the income affidavits a certain way, and I would venture to say that because of the diminished capacity of the brain due to the cancer, he may have just out of force of habit been signing it the same way, so I think those are two good reasons that her name may not appear on the income affidavit.”
Shratter then argued that, due to the 35-year marriage of Ms. Russo to the tenant of record, and due to the tenant’s illness, the income affidavits should not be dispositive and Ms. Russo should be allowed to remain in the apartment. Shratter then rested, without asking Ms. Russo a single question (tr at 27, line 5). Nor did he call any other witness with personal knowledge, such as Anna Plumey, the daughter of Ms. Russo and the tenant whose name and Bronx address were listed on the tenant’s death certificate as the informant. Ms. Plumey could presumably offer relevant testimony based on her close relationship with both of her parents and her co-occupancy with each of them at different times.
NYCHA counsel then began cross-examination, asking only a single question; that is, whether Shratter knew when Ms. Russo actually moved into the apartment. Shratter’s response was: “That I don’t know” (tr at 27, line 11). Again, however, no attempt was made to have Ms. Russo provide the details.
While the Hearing Officer did indicate that Ms. Russo had the right to testify, no real effort was made to encourage and facilitate such testimony. Indeed, on the contrary, a review of the transcript reveals that, if anything, Ms. Russo was discouraged from testifying (tr at 27-28). Ms. Russo attempted to explain that upon her discharge from St. Barnabas Hospital, her *410 husband told her to move in with him so he could take care of her. She did, but then he became ill and she took on the role of caretaker in their home (tr at 29).
When Ms. Russo tried to elaborate, the Hearing Officer shut her down, stating in terms too technical for a layperson to understand, let alone a person like Ms. Russo with limited English language skills and significant mental limitations, as follows (tr at 29, line 24 ff):
“Okay, well that’s more like a closing statement, but do you have any other evidence that you’d like to say, because if you want to have a moment for closing remarks, but do you want to testify is my question, if you want to testify, there will be a time that you want to speak at closing, you can.”
Obviously not understanding anything just said, Ms. Russo responded (tr at 30, line 6): “I have mixed up thoughts now.” And that was that for Ms. Russo’s case.
NYCHA then began its case and called the Housing Assistant John Joseph as its first and only witness. Mr. Joseph identified various isolated pages from income affidavits in the tenant’s file for 2007 and 2008, and these incomplete documents were admitted into evidence. The documents apparently showed that the tenant’s daughter Anna Plumey was listed as the emergency contact person with a separate Bronx address during those years (tr at 31-34). Counsel then inquired whether Mr. Plumey had ever requested permanent or temporary permission for Ms. Russo to live in the apartment, and the answer was “No” (tr at 34, line 5 ff). Mr. Joseph also testified that the management office was not aware that Ms. Russo was living in the apartment, but he at no point explained the basis for that conclusory opinion or even his role at the Housing Authority.
And that was that for NYCHA’s case. Although Mr. Shratter was offered the opportunity to cross-examine the witness, he declined, obviously lacking any understanding of what he could and should have been asking (tr at 34). Interestingly, when Ms. Russo was offered the opportunity to cross-examine Mr. Joseph, she declined but then added that she and Mr. Joseph knew one another: “I know him for awhile now. I go to his house” (presumably meaning his office) (tr at 35, line 10 ff). Although this testimony arguably contradicted Joseph’s statement that NYCHA was unaware of Ms. Russo’s occupancy, neither Shratter nor the Hearing Officer pursued it further. Ms. Russo’s statement also warranted further exploration in light of appellate *411 case law holding that a remaining family member applicant may be relieved of the written consent requirement if NYCHA knew of the applicant’s co-occupancy of the apartment with the tenant and implicitly approved of that occupancy {see discussion below regarding Matter of McFarlane v New York City Hous. Auth., 9 AD3d 289 [1st Dept 2004]).
The Hearing Officer then explained the procedure for closing statements. Relying on speculation that lacked any basis in fact or logic, counsel for NYCHA indicated that the pages he had admitted into evidence for 2007 and 2008 listing the daughter’s contact information belied any suggestion that Mr. Plumey did not know or understand how to complete the forms (tr at 38). He suggested that Ms. Russo’s marriage to the tenant was irrelevant, as there was no claim that the apartment had been the marital residence for 37 years. Offering an incomplete and misleading statement of the law that wholly ignored the McFarlane rule, he then added (tr at 38, line 18 ff): “the Housing Authority’s regulations strictly require that permission be granted for one year before the tenant of record dies or moves out, [so] even if that were the situation, she still would not be eligible to succeed to his lease.”
In his closing statement, Shratter effectively urged the Hearing Officer to grant an exception to the written permission rule articulated by NYCHA’s counsel in light of the tenant’s brain cancer and Ms. Russo’s own personal hardships (tr at 340, line 12 ff):
“She’s going to be seventy-three years old in August. Her only source of income is Supplemental Security Income, which is $781.00 a month. She cannot work. She doesn’t fit the profile for the shelter. Probably what would happen is she would be put in a nursing home, and that’s a great expense for the state. It would also be a terrible reduction for quality of life .... It’s not like she is at the stage of her life where she could go out and start anew or she can go rent an apartment or she has a job.”
When given an opportunity to comment, Ms. Russo pleaded that she be allowed to keep her apartment and spoke of her years there (tr at 42, line 13 ff):
“I hope I keep my apartment so much. I wish I stay there . . . until I die, then I will be cremated also and my daughter will pray . . . , but I wish I could remain there because there are so many memories *412 of my daughter being little . . . and he made me promise in his bed, that I will take care of him, and I take [care] of him for ten months.”
Perhaps noting Ms. Russo’s distress, the Hearing Officer then interrupted her and confirmed that the daughter mentioned by Ms. Russo was Anna Plumey, who Ms. Russo indicated was then living in Troy, near Albany. Remaining focused on procedural rules that neither Ms. Russo nor Mr. Shratter understood, rather than on a search for the truth and a just result that might include a continuance so that Anna Plumey could testify, the Hearing Officer placed further limitations on Ms. Russo’s case and rejected the evidence Ms. Russo was attempting to offer, stating (tr at 44, line 7 ff) that “Miss Russo’s closing statement sounds a little bit like testimony but it wasn’t, it was a closing remark.”
The Hearing Officer then told Ms. Russo to expect a written decision, which she had the right to appeal. She concluded the matter at 12:32 p.m. With a start time of 11:14 a.m. and a break of 30 minutes, the entire hearing lasted only 45 minutes, despite the overwhelming impact of the determination on Ms. Russo’s life and the significant amount of evidence that could have been offered in Ms. Russo’s favor had she been represented by counsel.
The Hearing Officer’s determination, rendered within four days, adopted NYCHA’s position in full (exhibit W). After briefly summarizing the evidence adduced by the parties and arguments made, the Hearing Officer stated her findings and conclusions in a single paragraph, relying for her decision solely on the lack of written permission from NYCHA for Ms. Russo’s occupancy:
“Grievant is not a remaining family member as defined by Housing Authority regulations. A tenant who wished to have an additional person, including spouses, join or re-join the household on a permanent basis must submit a written request to the development manager and receive written approval for the additional occupant; and the occupant must reside in the subject apartment for at least one (1) year after receiving the written permission and prior to the Tenant’s death . . . The Tenant did not receive written permanent permission of the Housing Authority for the Grievant to reside in the subject apartment.”
*413 NYCHA approved the Hearing Officer’s decision on July 18, 2012 (exhibit X). Ms. Russo timely commenced this article 78 proceeding in October 2012 representing herself, although Mr. Shratter may have assisted with the papers and he did appear at oral argument before this court. During the course of these proceedings, Mr. Shratter obtained and submitted to the court a letter dated January 18, 2013 from the Inwood Mental Health Center of The Washington Heights Community Service of New York State Psychiatric Institute. The letter, signed by Dora Cardenas, M.D., and Maria M. Kargman, LCSW, confirmed much of what Ms. Russo had attempted to explain at the hearing, including Ms. Russo’s co-occupancy with Mr. Plumey for more than one year. Significantly, Dr. Cardenas was the very same treating psychiatrist noted in the mental health evaluation completed by NYCHA’s social worker, yet no one contacted her for information until after the article 78 petition had been filed.
Even more significantly, though, the letter filled in many of the relevant details that any competent counsel would have adduced at the hearing in favor of Ms. Russo. The letter began by confirming that Ms. Russo had been a patient at the Inwood Clinic since 1982 where she was receiving treatment for psychotic and depressive symptoms and a diagnosis of schizo-affective disorder — bipolar type. The letter also confirmed numerous hospitalizations, including one from July 29, 2008 through March 11, 2009.
Most significantly, the letter went on to explain that, before her 2008-2009 hospitalization, Ms. Russo had been living with her daughter Anna Plumey. However,
“after her discharge in March [2009] she went to live with her husband, Efrain Plume [y], at [the NYCHA apartment] because it was felt that she was too fragile for her to stay alone while her daughter was away at work. Ms. Russo remained living with her husband even after she had improved because her daughter relocated to Troy, NY and she did not want to live alone.”
Her husband was then diagnosed with cancer, and Ms. Russo cared for him in the apartment until his death on May 30, 2010. But for a period of hospitalization in 2011 triggered in part by the loss, Ms. Russo remained in the apartment and continued to pay her rent.
The letter concluded with a plea that, for medical and humanitarian reasons, Ms. Russo be allowed to remain in the apartment:
*414 “Ms. Russo has never presented any problems as a tenant, has met her financial obligations, and is prepared to continue meeting these obligations. We feel that stable housing is critical to maintaining Ms. Russo’s psychiatric stability. She is a senior citizen with medical problems and a psychiatric disability, who has no family in the NYC area to rely on, and who is therefore a very vulnerable individual. We feel that being evicted from her current apartment would be a travesty and ask that you do everything within your power to assist her in her efforts to remain.”
Accepting these facts as true — and no competent evidence has been offered to rebut them — Ms. Russo lived in the subject NYCHA apartment with her husband the tenant of record from March 11, 2009, when she was discharged from the hospital, until Mr. Plumey died on May 30, 2010, a period of nearly 15 months. This period of co-occupancy satisfies the one-year requirement for succession rights mentioned by the Hearing Officer in her determination. Although the letter was not part of the record at the administrative proceeding and therefore is not part of the article 78 review here, the court is discussing the letter as it illustrates the evidence that could have and should have been offered at the hearing in Ms. Russo’s favor if the GAL were knowledgeable about the procedures, if Ms. Russo had had legal representation, and/or if the Hearing Officer had made a real attempt to ascertain the facts.
The question presented, then, is whether it was arbitrary and capricious for the Hearing Officer to apply the written permission requirement as a threshold mandate so as to deny Ms. Russo’s remaining family member grievance on that ground alone, despite the specific circumstances presented by this case. Of course, as always, the court must also consider whether the hearing comported with due process of law. In light of the important issues presented and Ms. Russo’s hardships, this court arranged for pro bono counsel to step in and supplement Ms. Russo’s papers and for NYCHA to respond. That has now been done, and the case is ripe for a determination.
Discussion
Any discussion of the questions presented here must necessarily begin with the fact that the written consent requirement is a creature of NYCHA policy, and not a mandate of federal law. As NYCHA correctly notes in its answer (¶ 9), federal regulations do require that a public housing lease contain a pro *415 vision that the tenant “must promptly inform [NYCHA] of the birth, adoption, or court-awarded custody of a child. The family must request [NYCHA] approval to add any other family member as an occupant of the unit.” (24 CFR 966.4 [a] [1] [v].) However, the regulation does not require that a request be made and granted in writing at least one year before the tenant dies or vacates in order for a remaining family member to stay on in the apartment. The written permission requirement — the sole basis for NYCHA’s decision and the primary obstacle for Ms. Russo here — appears only in NYCHA’s Management Manual.
Specifically, in chapter IV of the manual entitled “Occupancy,” under section XI entitled “Family Composition,” NYCHA sets forth the procedures for the addition of a family member or other person to the tenant household (exhibit A).[3] Subdivision (B) (2) there states that a tenant seeking to have an adult family member move in on a permanent basis “must make a written request to the Housing Manager by submitting NYCHA form 040.012, Permanent Permission Request for Family Member/Additional Person to Live with a Development Tenant, (Permanent Residency Permission Request form).” If the request is made in some other manner, NYCHA has a duty to assist the tenant; that is, “staff shall supply this form to the tenant and require that both the tenant and the prospective additional person complete and return the Permanent Residency Permission Request form to the Development Management Office.”
The manual goes on to state “conditions” for the granting of permanent permission, all of which Ms. Russo appears to satisfy. For example, a wife is expressly included among the list of eligible persons, assuming she passes a criminal background check and is not otherwise deemed undesirable by virtue of a prior eviction or exclusion from NYCHA housing or because the additional person would cause overcrowding in the apartment. NYCHA may request documents and conduct a personal interview, but must render a determination in writing within 60 days by completing a section of the request form and returning it to the tenant. NYCHA’s failure to timely issue a determina *416 tion constitutes a deemed denial, thereby penalizing the tenant, but never NYCHA., for the agency’s failure to comply with the procedures.
NYCHA here also relies on chapter iy section XII, of the manual entitled “Remaining Family Members (Succession Rights).” Again, NYCHA does not cite to any federal law or regulation expressly addressing this issue, as none exists, but it relies only on its manual. The two “conditions” to acquire remaining family member (RFM) status are listed in subsection A; namely, (1) “lawful entry” and (2) “continuous occupancy.”
As relevant here, to satisfy the “lawful entry” criterion, an RFM claimant must show that she “Obtained Permanent Residency Permission (i.e., written permission) from the Housing Manager (according to Section XI.B.2).” To establish the second criterion of “continuous occupancy” the RFM claimant
“who received the Housing Manager’s written Permanent Residency Permission . . . must remain in continuous occupancy, (i.e., [be named] on all Occupant’s Affidavits of Income) from the date of issuance of the Housing Manager’s written Permanent Residency Permission for not less than one year immediately prior to the date the tenant vacates the apartment or dies. If the authorized occupancy is less than one year, the RFM claimant is denied Remaining Family Member status.” (NYCHA Management Manual, ch iy § II [A].)[4]
The provision on which the Hearing Officer relied (albeit with no citation) related to the written permission requirement for the first condition of “lawful entry”; scant effort was made to confirm the length of Ms. Russo’s occupancy but, as indicated above, the letter from Ms. Russo’s treating psychiatrist suggests that Ms. Russo, in fact, occupied the apartment for more than one year before her husband, the tenant, died. As previously noted, the sole basis for the Hearing Officer’s decision was the permission rule: “The Tenant did not receive written permanent permission of the Housing Authority for the Grievant to reside in the subject apartment.”
This court recognizes that it is important for NYCHA to maintain standards of eligibility for public housing apartments *417 and to be generally aware of who is occupying those apartments. The court further recognizes, as NYCHA counsel repeatedly notes, that the Appellate Division, First Department, has upheld NYCHA’s rejection of an RFM claim by a spouse based on the claimant’s failure to satisfy the written permission and one-year occupancy requirements. (See Matter of Adler v New York City Hous. Auth., 95 AD3d 694 [2012]; Rosello v Rhea, 89 AD3d 466 [2011]; NYCHA mem of law at 6.) Nevertheless, these facts and cases do not mandate a finding that NYCHA properly applied its policy here to deny Ms. Russo RFM status under the particular facts and circumstances presented in this particular case.
Nor is such a finding mandated by Matter of Henderson v Popolizio (76 NY2d 972 [1990]), as urged by NYCHA in its memorandum of law (at 6). While the Court of Appeals did reference the remaining family member rules in NYCHA’s Management Manual, the focus of the decision was on the grievant’s request for a formal hearing, rather than on the proper application of the requirements for RFM status. Thus, Henderson cannot be viewed as a wholesale adoption by the courts of NYCHA’s manual (see also n 4, supra). If anything, the Court of Appeals recently held that a party’s “technical noncompliance” with a housing agency’s succession rules should not bar an otherwise meritorious RFM claim. (Matter of Murphy v New York State Div. of Hous. & Community Renewal, 21 NY3d 649, 655 [2013].) One must look not only to the wording of the rules, but also to the broader policy that the federal housing program was designed to promote, the Court indicated. While Murphy was decided in the context of Mitchell-Lama housing, the principle was broadly articulated and applies with equal force here to NYCHA’s succession rules.
Contrary to NYCHA’s claim (at 8), this court’s inquiry does not end simply because Ms. Russo did not obtain written permission to share her husband’s apartment before his death. Nor is this court barred from considering the condition of the tenant of record and the circumstances in the household, as NYCHA so vigorously argues (at 8-11). Although the courts may not annul a NYCHA decision to terminate a tenancy simply because public housing is the tenant’s last resort, the courts must still consider the totality of the circumstances, including mitigating factors. (See Matter of Perez v Rhea, 20 NY3d 399 [2013].)
What is more, NYCHA at the hearing and in its papers here ignores that the First Department recognized a more flexible in *418 terpretation of the written permission rule in Matter of McFarlane v New York City Hous. Auth. (9 AD3d 289 [2004]). The petitioners in McFarlane were the grandchildren of the deceased tenant of record in a NYCHA apartment. Their application for remaining family member status was denied, and while the Supreme Court annulled NYCHA’s determination as arbitrary and capricious, the Appellate Division reversed and reinstated NYCHA’s denial. The focus of petitioner’s argument there was that NYCHA had erred in applying the written consent requirement in a rigid fashion as if it were a federal rule or regulation, when in fact the consent requirement was only a policy stated in the NYCHA manual. The Appellate Division found that the “submitted evidence did not warrant results other than those reached here.” (Id. at 290.)
Significantly, however, the Appellate Division went on to recognize that the circumstances of a particular case could provide a basis for relieving an RFM applicant of the strictures of the written consent requirement, stating as follows (at 291):
“One type of circumstance that could be of critical importance in establishing a right to be treated as a remaining family member despite the absence of notice or written consent would be a showing that the Authority was aware of the petitioner having taken up residence in the unit, and implicitly approved it. This is so because the controlling statute and regulations express an overriding policy that the public housing authority administering the program should have the untrammeled authority to monitor and approve who lives in its buildings, in order to ensure the overall purpose of providing decent and safe housing to low income families (see 42 USC § 1437 [a] [1] [C]). Therefore, a showing that the Authority knew of, and took no preventive action against, the occupancy by the tenant’s relative, could be an acceptable alternative for compliance with the notice and consent requirements. Here, however, neither of the petitioners offered evidence showing that the agency was aware of their presence.”
This court rejects as misguided any suggestion that the appellate courts have implicitly overruled McFarlane by citing the rule articulated in Matter of Schorr v New York City Dept. of Hous. Preserv. & Dev. (10 NY3d 776, 779 [2008]), that “estoppel cannot be invoked against a governmental agency to prevent it from discharging its statutory duties.” Schorr involved an *419 entirely different set of circumstances and is readily distinguishable from the case at bar. The petitioner there was the son of the tenant of record seeking to succeed to a Mitchell-Lama apartment. The limited-profit housing company that owned and operated the apartment pursuant to the Mitchell-Lama Law had apparently known of petitioner’s occupancy and had acquiesced to his remaining as the sole occupant of the apartment.
At some point the housing company asked its supervising agency the New York City Department of Housing Preservation and Development (HPD) to issue a certificate of eviction because the petitioner did not meet the succession requirement of co-occupancy with the tenant of record for two years prior to the tenant’s departure. Specifically, they asserted that the petitioner had left the apartment several years earlier for college and there was no indication that he had returned until shortly after his parents had vacated. HPD issued the certificate of eviction because petitioner could not establish that he qualified for succession rights. Petitioner then commenced an article 78 proceeding to annul the certificate of eviction, arguing that HPD and the housing company were estopped from evicting petitioner because of the housing agency’s apparent consent to the tenancy.
The Supreme Court agreed, and the Appellate Division affirmed that determination. The Court of Appeals reversed. Finding that “it is clear that petitioner did not meet the eligibility requirements for succession rights to the apartment and was, therefore, an illegal tenant,” the Court held (at 779) that “invoking estoppel against HPD and [the housing company] would impermissibly prevent HPD from executing its statutory duty to provide Mitchell-Lama housing only to individuals who meet the specified eligibility requirements.”
It cannot be overemphasized that the principle was being applied to bar a finding of estoppel against HPD based on inaction by the housing company in failing to commence eviction proceedings earlier. In McFarlane, in contrast, the focus is solely on the consequences to NYCHA of its own conduct. More importantly, though, the principle applied in McFarlane has nothing to do with estoppel, but rather it indicates that NYCHA may consider whether, under the particular circumstances of a particular case, it is appropriate to relieve a party of strict compliance with the written consent requirement (as NYCHA in its manual has expressly chosen to do with minors who join the household via adoption or guardianship, as confirmed above).
*420 The Appellate Division has had countless opportunities after 2008 to expressly reject the McFarlane doctrine based on Schorr, but it has not done so. Indeed, the Court has done the opposite. For example, three years after Schorr in Matter of Echeverria v New York City Hous. Auth. (85 AD3d 580, 581 [2011]), the First Department cited McFarlane for the principle that a basis may exist “for relieving petitioner of the written notice requirement” based on NYCHA’s knowledge or implicit approval of the applicant’s residency, even though it found that the evidence of record in that case did not support such a finding.
The following year in Matter of Adler v New York City Hous. Auth. (95 AD3d 694 [2012]), the First Department was directly presented with another opportunity to overrule McFarlane, but it again chose not to do so. The trial court there extensively discussed and quoted McFarlane with approval in a succession case involving a married couple, but found after applying the McFarlane rule that the evidence did not support a finding in petitioner’s favor. (Matter of Adler v New York City Hous. Auth., 31 Misc 3d 1205[A], 2011 NY Slip Op 50499[U] [Sup Ct, NY County 2011].) The Appellate Division affirmed the lower court, but did not in any way criticize the lower court’s validation of the McFarlane rule or its inquiry as to whether the petitioner had proved at the hearing that NYCHA’s knowledge and implicit acceptance of the occupancy justified relieving her of the written consent requirement.
Equally significant is the First Department’s decision a few months later in Matter of Kwan Fong Fung v New York City Hous. Auth. (99 AD3d 452 [2012]). The Hearing Officer there upheld the agency’s decision to deny succession rights based on the absence of written consent. The Hearing Officer specifically noted that NYCHA had previously denied the applicant’s request for temporary permission to occupy the apartment so as to care for the tenant of record, and she gave little weight to the fact that the applicant had nevertheless moved in and included the name and income on the annual income affidavit for a period of time before the tenant died.
For the first time in the article 78 proceeding, the applicant sought to rely on the McFarlane rule. In an extensive decision denying the petition on multiple grounds, the lower court stated that the decision by the Court of Appeals in Schorr “abrogates” McFarlane. (Matter of Kwan-Fong Fung v New York City Hous. Auth., 33 Misc 3d 260, 265 [Sup Ct, NY County 2011].) Although the Appellate Division did affirm the lower court and cite Schorr, *421 it did not state that McFarlane had been abrogated, nor make any mention of the lower court’s discussion of that case. If anything, by citing Adler, where the lower court had cited McFarlane with approval, the Court suggested that McFarlane still is viable.
The Appellate Division resolved any doubt about the viability of McFarlane in its decision rendered just last year in Matter of Gutierrez v Rhea (105 AD3d 481 [2013], lv denied 21 NY3d 861). The petitioner there, who had grown up in the apartment but then left at age 21, sought to succeed to the tenancy of his late mother as a remaining family member in a NYCHA apartment. When the mother became ill, she applied to have her son move back to the apartment to assist her. NYCHA did not respond, but the tenant thereafter reported that her son had moved in and she listed him on the annual income affidavits for four years. At some point thereafter, NYCHA determined that the son was ineligible for a NYCHA tenancy based on his criminal background, but the agency failed to give the tenant an opportunity to prove rehabilitation in accordance with NYCHA rules. The tenant then passed away, and the son applied for remaining family member status.
Although the son presented substantial evidence of rehabilitation, NYCHA denied the son remaining family member status after a hearing, and the Supreme Court dismissed the article 78 proceeding. The Appellate Division reversed on the ground that the decision was not supported by substantial evidence. Focusing on the unique facts of the case, the First Department annulled NYCHA’s decision and remanded for a determination whether the son, who had clearly co-occupied the apartment with the tenant for the requisite time, could safely continue his occupancy in light of his psychological disability.
Extremely significant, however, was the Appellate Division’s express adoption of the McFarlane rule to reject the notion that the absence of written consent, standing alone, mandated the denial of RFM status, stating (at 485-486) that
“[f]inally, while estoppel is not available against a government agency engaging in the exercise of its governmental functions . . . , we have held that NYCHA’s knowledge that a tenant was living in an apartment for a substantial period of time can be an important component of the determination of a subsequent RFM application [McFarlane]. In addition, [petitioner] has had no problems in the build *422 ing or the neighborhood since moving back home in 2004.”
Thus, as the Court of Appeals did in Murphy, the Appellate Division in Gutierrez indicated that NYCHA should consider each case on its own unique set of facts to determine whether the particular facts and circumstances justify relieving the tenant of strict compliance with the literal terms of each and every succession requirement. The rules must be applied in a manner consistent with the spirit of the law and the public policy supporting succession rights, the true and complete facts presented, and the realities of everyday life.
In seeking to affirm the agency’s decision here, NYCHA counsel does the opposite, and offers virtually every argument in the book in that effort. Completely unpersuasive are NYCHA’s claims that Ms. Russo cannot raise her own disability because she “waived reliance on documents she failed to submit into evidence at the hearing” (at 16). Frankly, it is rather absurd to even suggest that a self-represented mentally disabled person such as Ms. Russo voluntarily relinquished “a known right with both knowledge of its existence and an intention to relinquish it” so as to result in a waiver. (City of New York v State of New York, 40 NY2d 659, 669 [1976].) Nor can a waiver be attributed to omissions by the untrained guardian ad litem.
Shocking indeed is NYCHA’s claim that equity bars a determination in petitioner’s favor due to “unclean hands” because Ms. Russo did not report her income on the annual affidavit (at 19). While the record at the hearing was not fully developed as the guardian ad litem was ill-equipped to do so, the record does contain findings made by NYCHA’s own professionals that Ms. Russo had limited education, suffered from a mental disability, and was unable to protect her own rights. These facts belie any claim of unclean hands.
In any event, it was the obligation of the tenant, not Ms. Russo, to complete the form, and the only affidavit at issue was a single one completed in June 2009, a few months after Ms. Russo moved into the apartment upon discharge from an extended hospitalization for psychiatric reasons and at or about the time that the tenant himself purportedly began exhibiting symptoms of brain cancer. As petitioner’s pro bono counsel notes in her supplemental papers, the decision by the Court of Appeals in Murphy compels a finding here that the tenant’s failure to file a single income affidavit should not be dispositive of Ms. Russo’s rights, particularly since the circumstances suggest a *423 reasonable excuse for the failure to file. (See Matter of Murphy v New York State Div. of Hous. & Community Renewal, 91 AD3d 481, 482 [2012].) Rather, succession policies should be applied in keeping with their “remedial purpose”: “Succession is in the spirit of the statutory scheme, whose goal is to facilitate the availability of affordable housing for low-income residents and to temper the harsh consequences of the death or departure of a tenant for their ‘traditional’ and ‘non-traditional’ family members.” (Murphy, 21 NY3d 649, 653 [2013].)
NYCHA’s counsel goes to great lengths to distinguish Murphy from this case, offering six different enumerated arguments and commentary critical of Ms. Russo’s pro bono counsel (see Jan. 16, 2014 aff). However, the attempt is unavailing.
First, counsel notes that the Murphy court recognized that a housing agency has “a compelling interest in encouraging the timely filing of income affidavits in order to fairly and efficiently administer their programs by calculating rent and monitoring eligibility for their programs, and that failure to file income affidavits can result in harsh penalties, including eviction.” (See also 21 NY3d at 654.) As previously noted, this court recognizes that income affidavits can play a valid role in housing policy, but like the Murphy court, this court holds that the requirement should not be blindly applied to deny an otherwise strong and compelling RFM case, such as the ones presented in Murphy and here, based on a single affidavit.
Second, counsel seeks to limit Murphy to the Mitchell-Lama program, a separate housing program with different requirements. However, as both regulatory schemes speak on the same matter or subject — affordable housing for low and/or middle income residents — and the succession rules in both cases serve the similar purpose of avoiding disruption upon the death of a family member, the same result should obtain here pursuant to the doctrine of in pari materia. (See e.g. Matter of Lower Manhattan Loft Tenants v New York City Loft Bd., 66 NY2d 298, 304 [1985].) That the Mitchell-Lama program does not contain the written permission requirement at issue in this NYCHA case does not prevent the application of the broader statement by the Murphy court that public housing policies (as opposed to the mandates of federal law) should not be applied in an overly rigid, hyper-technical fashion when the equities of the case and the spirit of the law suggest otherwise.
This court also rejects as specious NYCHA’s third claim that Murphy should be disregarded because the principal purpose of *424 the income affidavit for Mitchell-Lama occupants is proof of primary residence, “a concept foreign to the Housing Authority’s remaining-family-member policy.” According to counsel (¶ 5), “the principal purpose of the [NYCHA] income affidavit is to show compliance with its one-year and continuous occupancy requirements,” which to this court is a distinction without a difference. Also irrelevant for these purposes, and not quite accurate in light of NYCHA’s own presentation at the hearing, is the fact that NYCHA requires an RFM claimant to satisfy “the threshold requirement” of written permission before even considering income affidavits.
NYCHA’s fourth argument ignores the unique facts and circumstances of Ms. Russo’s case. Specifically, counsel seeks to distinguish this case from Murphy because the RFM claimant there had presented overwhelming proof of his occupancy, while Ms. Russo did not. But Ms. Russo — found by NYCHA to be suffering from hallucinations and unable to protect her rights — did not know what proof to submit. Nor did the guardian ad litem. And both NYCHA’s counsel in her arguments and the Hearing Officer seriously err by accepting as gospel the statements by the GAL regarding Ms. Russo’s occupancy, as the statements have no basis in personal knowledge.
Shifting its position, NYCHA in its fifth argument distinguishes Murphy by placing great weight on the income affidavits; that is, she notes that the RFM claimant in Murphy had been listed on all income affidavits but one, whereas here Ms. Russo was never listed. But counsel ignores that, here too, only one income affidavit was at issue, in this case for June 2009, as Ms. Russo apparently moved into the apartment in March 2009 and her husband the tenant passed away in May 2010 before the 2010 affidavit was filed.
NYCHA’s sixth argument completely ignores the fundamental principle of law that findings of fact must be based on competent evidence. Again seeking to distinguish Murphy, counsel notes that the petitioner there had “overwhelming evidence of primary residence” whereas here “the tenant of record did not list Petitioner on his income affidavits because she did not reside in his apartment.” Counsel is in no position to make such a declaration when she has no personal knowledge and evidence exists suggesting otherwise. The fact that NYCHA’s counsel even makes such a claim serves only to highlight the inadequacies of the hearing at which neither NYCHA nor the Hearing Officer made a serious effort to ascertain the true and complete set of *425 facts. While the Hearing Officer may have had a limited duty to “explicitly invite” Ms. Russo to introduce evidence in her favor, she clearly had a duty to ensure that the hearing comported with due process, particularly in light of NYCHA’s finding that Ms. Russo was incompetent and unable to protect her own rights. (Matter of Grant v New York City Hous. Auth., 116 AD3d 630, 630 [1st Dept 2014].)
But NYCHA’s primary argument, which it repeats over and over throughout all its papers, is that the tenant’s failure to obtain written permission for his wife Ms. Russo to live with him is an absolute bar to succession rights, standing alone. This interpretation of NYCHA policy, in light of the facts of this case and the teachings of Murphy, McFarlane, and Gutierrez, cannot be sustained. Just as the manual dispenses with the permission requirement for children brought into the home via adoption and guardianship, NYCHA should consider the proper application of the written permission requirement for disabled spouses like Ms. Russo and determine whether circumstances exist that justify relieving Ms. Russo of the strictures of technical compliance with the policy.
Nor can the court accept NYCHA’s insistence that Ms. Russo’s hearing comported with the requirements of due process of law simply because NYCHA followed its mental competency procedures. While NYCHA correctly determined that Ms. Russo was incapable of protecting her own rights, the hearing transcript reveals that the GAL did not fully develop the record on Ms. Russo’s behalf and adequately protect her rights. On the contrary, his presence may well have adversely affected Ms. Russo, as it perhaps created the appearance that her rights were being protected when in fact they were not.
As indicated above, evidence was available to confirm Ms. Russo’s occupancy of the apartment from Ms. Russo’s health care providers and her daughter as well. Ms. Russo and her daughter shared an apartment on Webster Avenue in the Bronx until Ms. Russo was hospitalized in 2008 and then discharged to the NYCHA apartment in 2009 to live with her husband (Anna’s father) Mr. Plumey. The GAL apparently did not understand the importance of obtaining and offering that evidence. NYCHA counsel and the Hearing Officer undeniably did, but simply glided through the hearing under the pretense that the GAL knew how to protect Ms. Russo’s rights.
Ms. Russo’s pro bono counsel in her April 2013 supplemental papers vigorously — and correctly — asserts that the hearing did not comport with due process of law. She notes, for example, *426 that the Hearing Officer not only treated the GAL as if he had the training of a lawyer, but she erroneously accepted as evidence statements made by the GAL that had no basis in personal knowledge. Also, she did not truly give Ms. Russo an opportunity to be heard by rejecting proferred testimony that was not offered in accordance with procedural rules.
Further deferring to NYCHA’s arguments, the Hearing Officer accepted into evidence income affidavits for 2007 and 2008, years indisputably preceding Ms. Russo’s occupancy, as proof that the tenant knew how to complete the forms and was capable of doing so correctly. Not only is that claim purely speculative and wholly devoid of evidentiary value, but it is in no way probative of the tenant’s abilities after Ms. Russo moved into the apartment in 2009 and the tenant began displaying symptoms of brain cancer. As for the written permission requirement, few people would think that advance written permission from NYCHA is needed for a husband and wife to live together, and the failure of the tenant here to know that policy and act on it is more than understandable.
Rather than treating the written consent requirement as a threshold litmus test in each and every case, NYCHA should instead consider each case on its own merits. In light of the First Department’s decision in cases such as Adler, this court is not suggesting that the written permission requirement may never be applied in succession cases involving spouses. Instead, this court finds that the policies underlying public housing, and the teachings of Murphy and Gutierrez, require that the policy be applied in the context of the facts of the particular case and in keeping with the spirit of succession rights and that an inquiry be made in appropriate cases such as this as to whether McFarlane justifies relieving the applicant of the strictures of the written consent requirement in the particular case presented.
The court rejects completely NYCHA’s misguided claim in its final set of papers that the case should be transferred to the Appellate Division pursuant to CPLR 7804 (g) for a determination whether the Hearing Officer’s decision was based on substantial evidence. The statute directs the court to “first dispose of such other objections as could terminate the proceeding.” (CPLR 7804 [g].) Here, this court can, and is, resolving the proceeding on the grounds that the hearing failed to comport with the requirements of due process of law and that NYCHA applied its written permission requirement to this case in an arbitrary and capricious manner.
NYCHA in its final papers goes to great lengths to demon *427 strate that the agency appropriately appointed a guardian ad litem when it had no duty to do so. The court agrees that NYCHA correctly determined that Ms. Russo was unable to protect her own rights, but the record also demonstrates without a doubt that the appointment of the GAL, standing alone, did not guarantee that the hearing complied with due process of law. This court need not find that the Hearing Officer was biased to conclude that the basic tenets of due process were not satisfied. As indicated above, partial documents were accepted into evidence, attempts by Ms. Russo to offer evidence were rebuffed, and statements not based on personal knowledge and lacking in evidentiary value were accepted as the basis for findings of fact. Due process demands otherwise.
 In sum, NYCHA’s decision rejecting Ms. Russo’s remaining family member claim must be annulled as arbitrary and capricious and violative of due process of law, and the matter must be remanded for a new hearing. Ms Russo is entitled to a fair hearing where the record can be fully developed on the relevant issues of the length of Ms. Russo’s co-occupancy with her husband and NYCHA’s knowledge and implicit acceptance of that co-occupancy. Specifically, Ms. Russo’s fragmented testimony at the hearing (tr at 35), that she knew the Housing Assistant John Joseph “for awhile” and went “to his house” should be fully explored, and the knowledge of the daughter and perhaps others should also be examined to determine whether evidence exists allowing the application of the McFarlane rule. At the new hearing, NYCHA’s succession policies must be fairly applied in accordance with the terms of this decision and the dictates of the Court of Appeals and the First Department to determine whether the particular facts and circumstances of this particular case justify relieving petitioner of the strictures of the written consent requirement and allowing her to otherwise establish her entitlement to remaining family member status.
Accordingly, it is hereby ordered and adjudged that the petition is granted to the extent of annulling the July 18, 2012 determination by respondent New York City Housing Authority, which approved the June 19, 2012 decision by NYCHA Hearing Officer Arlene Ambert denying the “remaining family member” claim of petitioner Clara Josefina Russo, and the matter is remanded for a new hearing before a different hearing officer consistent with the terms of this decision.

. All referenced exhibits are attached to NYCHA’s answer, unless otherwise noted. The facts are inferred from various documents, as little evidence was presented at the hearing.

. The report also indicated that Ms. Russo was receiving treatment and medication for cardiac issues, high blood pressure, arthritis, and related medical problems.

. Separate procedures are included for the addition of children to the household by means of birth, adoption or guardianship. The tenant must give notice, but permission is assumed, unless a child who is 16 or older seeks to join the household but fails a criminal background check. While this decision will focus on the procedures for adult family members seeking to join, as those are the procedures relevant to Ms. Russo in this case, it is nevertheless noteworthy that the manual does not require written permission in all cases.

. Although the manual indicates that the one year is measured from the date written permission is given, the First Department typically considers simply whether the co-occupancy existed for one year prior to the tenant’s death. (See e.g. Matter of Adler v New York City Hous. Auth., 95 AD3d 694, 695 [2012]; Rosello v Rhea, 89 AD3d 466 [2011].)